**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. _25-mj-6023-STRAUSS_____

UNITED STATES OF AMERICA

v.

ALEX EUGENE BENEFIELD,

     Defendant.

_____/

FILED BY_____*AT*_____D.C.

**Jan 15, 2025**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Mills Maynard)?     No.

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)?    No.

3. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023?  No.

4. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024?  No.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:   _/s/ Alexandra D. Comolli_____
ALEXANDRA D. COMOLLI
Assistant United States Attorney
Court ID No. A5502803
99 Northeast 4th Street
Miami, FL. 33132-2111
Tel: (305) 961-9040
Fax: (305) 536-4089
Alexandra.Comolli@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Alex Eugene Benefield, | ) | Case No.  25-mj-6023-STRAUSS |
| | ) | |
| | ) | |
| | ) | |

*Defendant*

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   as early as in or around February 2023 through on or about January 14, 2025   in the county of _____Broward_____ in the

___Southern___ District of _____Florida_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy |
| 7 U.S.C. § 2156 | Animal Fighting Venture Prohibition |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Hunter I. Sargent, FBI
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by ___FaceTime___

Date: ___01/14/2025___  (15)

_____
*Judge's signature*

City and state:    Fort Lauderdale, Florida

Hon. Jared M. Strauss, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Hunter I. Sargent, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent for the Federal Bureau of Investigation ("FBI") currently assigned to the Transnational Organized Crime squad in the Miami Division. I have been an FBI Special Agent since June 2022. As a Special Agent, I have conducted and participated in multiple organized crime investigations and my duties and responsibilities involve the investigation of various violations of federal law, including organized criminal conspiracies, illegal animal fighting ventures, illegal gambling businesses, money laundering, among others. I have received training in how to conduct investigations of organized crimes, which includes illegal animal fighting ventures, money laundering, and the related statutes. I received training at the FBI Academy in various aspects of criminal investigations, such as witness and investigative interviews, search and arrest warrant operations, physical and electronic surveillance, and confidential human sources. As a result of my experience and studies in organized crimes and money laundering, I am familiar with the strategies, methods and techniques of organized criminal groups and I know that evidence of their illicit activities often is contained in electronic storage media, including emails, computers, cell phones, and thumb drives. Prior to becoming an FBI Special Agent, I was a commissioned officer in the U.S. Marine Crops where I served as a Military Police Watch Commander at Camp Lejeune, North Carolina where I oversaw policing and security operation aboard Marine Corps Base Camp Lejeune.

2.      Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that Alex Eugene BENEFIELD (hereinafter, "BENEFIELD") violated

Title 18, United States Code, Section 371 (conspiracy); Title 7, United States Code, 2156(b) (possessing or training animals for participation in animal fighting venture).

3.      Through training and investigations of animal fighting offenses, I am familiar with the actions, traits, habits, and terminology used by handlers or owners of dogs involved in animal fighting ventures. I have also participated in investigations of suspected animal fighters.

4.      The information contained in this affidavit is based upon my personal knowledge, my review of documents and records as described below, my training and experience, as well as information provided to me by a confidential human source ("CHS") and other law enforcement personnel during this ongoing investigation. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter. Rather, I have included only the facts that are sufficient to establish probable cause for the issuance of a criminal complaint against BENEFIELD for the above-described criminal violations. Where statements of others are set forth in this affidavit, they are set forth in substance and in part. In addition, the events described in this affidavit occurred on or about the dates provided herein.

## BACKGROUND ON DOG FIGHTING

1.      The federal Animal Welfare Act defines "animal fighting venture" as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment." 7 U.S.C. § 2156(f)(1). It is illegal to sponsor or exhibit an animal (*i.e.*, fight an animal) in an animal fighting venture. 7 U.S.C. § 2156(a)(1). It is also illegal to possess, train, sell, buy, transport, deliver or receive an animal for purposes of having the animal participate in an animal fighting venture. 7

U.S.C. § 2156(b). Each of these offenses are felonies punishable by up to five years in prison. 7 U.S.C. § 2156(i); 18 U.S.C. § 49.

2.      The Animal Welfare Act states, "[a] warrant to search for and seize any animal which there is probable cause to believe was involved in any violation of this section may be issued by any judge of the United States or of a State court of record or by a United States magistrate judge within the district wherein the animal sought is located." *Id.* Any animal "involved in any violation of this section shall be liable to be proceeded against and forfeited to the United States" in either a civil or criminal proceeding. *Id.*; 28 U.S.C. § 2461.

3.      The remaining paragraphs in this section of the affidavit are based on my training and experience investigating animal fighting ventures, and on information provided to me by other law enforcement personnel who have extensive experience in investigative animal fighting ventures. In the United States, dog fighting ventures involve "pit bull"-type dogs, which dog fighters prefer for their compact muscular build, short coat, and the aggression that some display toward other dogs. A dog fight occurs when two dogs are knowingly released by their handlers in a controlled environment to attack each other and fight. The fight ends when one dog withdraws, when a handler "picks up" their dog and forfeits the match, or when one or both dogs die.

4.      Dog fighters fight dogs with a goal of obtaining "Champion" or "Grand Champion" status for their dogs, which is achieved by winning three or five fights, respectively. They maintain contact with other dog fighters around the country, and can generate substantial income from gambling on dog fights and from the sale and breeding of fighting animals. It is common for successful dog fighters to sell Champions and Grand Champion dogs to other dog fighters and to breed and sell puppies from Champions and Grand Champions to other dog fighters.

5.      Some dog fighters are selective about who they will sell fighting dogs to, because the success of that dog in the fighting ring will reflect on the seller whose "bloodline" is represented by the dog. A dog that produces multiple offspring that go on to be "Champions" (*i.e.*, winning three or more dog fights) is bestowed the "Register of Merit" ("ROM") or "Producer of Record ("POR") title. This provides incentive to the seller to sell dogs to capable dog fighters, with the intention that the dogs will be fought.

6.      It is common for those operating dog fighting ventures to maintain "pedigrees," books, records, ledgers, and journals relating to the possession, purchase, transportation, sale, breeding, and training of fighting dogs. These materials exist in both hard and electronic copy. The "pedigree" of a fighting dog shows the dog's name, with reference to the dog fighting "kennel," as well as breeding lineage going back multiple generations, with references to the number of fights won by that dog and its predecessors. Pedigrees are important in the dog fighting industry because they allow dog fighters to maintain information on whether a particular bloodline or breeding combination resulted in desired fighting traits. Dog fighters also often maintain ledgers and journals that specifically depict how certain dogs performed during a particular fight, together with the duration and outcome of fights.

7.      Dog fighters select the strongest, most capable fighting dogs and selectively breed, sell, and fight only those dogs that display particular traits. Some of these traits are: (1) "gameness" or aggressiveness and propensity to fight other dogs; (2) a willingness to continue fighting another dog despite traumatic and/or mortal injury; and (3) cardiovascular endurance to continue fighting for long periods of time and through fatigue and injury. Dogs displaying these attributes are often bred with other dogs displaying similar traits to enhance the bloodline of these dogs for fighting

purposes. Dog fighters such as the individuals described in this affidavit keep such dogs solely for fighting purposes.

8.      Once a dog fighter locates an opponent and agrees upon terms, the match is "hooked" or set up. The dog then typically undergoes a conditioning process which dog handlers refer to as a "keep." A "keep" is typically conducted for six to eight weeks before the scheduled match and involves a training program including: treadmills used to run and exercise the dogs away from public view; weighted chains and pulling devices used to increase the dog's strength and stamina; the use of devices such as "spring poles" and "flirt poles" to build jaw strength and increase aggression; water-based training such as tethering a dog to a cable running across a pool; and the administration of drugs, legal and illegal, including steroids to build muscle mass and aggression. Animal pelts are also common for dog fighters to use to excite and bait dogs during dog fighting training sessions.

9.       Dog fighters often attempt to mend the injuries of their own dogs, rather than seek veterinary attention, which might raise suspicion regarding the cause of their dogs' injuries.

10.      The most common way that a dog fighter tests a particular dog to ascertain whether the dog is "game" is to "roll" the dog. A "roll" is a dog fight conducted for purposes of "game-testing" rather than for wagering. "Roll" fights generally last from five to fifteen minutes, at which point the handlers usually stop the fight. However, "roll" fights can result in serious injury or death to one or both dogs. Dogs that lose fights or fail to show "gameness" are often killed. It is not uncommon for dogs that lose matches to be killed in cruel, torturous, and inhumane ways as punishment.

11.      Not all dogs in a litter of puppies bred from fighting dogs will show inclination to fight. Dog fighters refer to dogs who do not demonstrate fighting instinct by the time they reach

maturity as "cold" or "shy." Because such dogs have no value to a dog fighting operation, they are often culled, to use a word employed by dog fighters. To avoid public scrutiny, dog fighters typically do not sell these dogs to non-dog fighters or take them to an animal shelter. "Culling" generally results in the death of these animals. Federal agents are aware of dog fighting targets and defendants having killed dogs by shooting them, strangling them, bludgeoning them, or drowning them.

12.     It is a common practice for those involved in training and exhibiting fighting dogs to possess several dogs at one time. This practice is followed for several reasons. First, dog fighters maintain a stock of dogs at different weights and both sexes because, in dog fights, dogs are matched against other dogs within a pound of the same weight against dogs of the same sex. Maintaining a stock of several dogs thus increases the odds of owning a dog whose weight meets the requirements for a match solicited by an opponent. Second, dog fighters also maintain multiple dogs in order to selectively breed, sell, and fight dogs displaying certain traits or to otherwise advance a particular dog fighting bloodline.

13.     Further, dog fighters must possess an inventory of dogs because dogs often die or are badly injured during fights. Possessing multiple dogs also increases the prospects of owning a dog who will become a Champion or Grand Champion. Dog fighters also routinely test and "roll" their dogs, including against their own dogs.

14.     Dog fighters sometimes breed their own fighting dogs from dogs they already own, and sometimes buy fighting dogs from other dog fighters, either as adult dogs or puppies. When dog fighters acquire dogs from other dog fighters, they sometimes do so in order to integrate desired fighting traits or "bloodlines" from other dog fighters into their own stock.

15. Dog fights typically involve consistent practices leading up to and during the fight. Fighting dog owners or handlers enter into a verbal or written contract with their opponent several weeks before the dog fight, often referred to as a "match" or "show." The owners or handlers agree upon: (1) the sex and weight of the dogs at the time of the fight; (2) the geographic area in which the fight will occur (the exact location of which is often a guarded secret until shortly before the fight); (3) a referee; (4) the payment of "forfeit" money that is lost if one participant pulls out of the match or if a participant's dog does not arrive at the agreed-upon weight; and (5) monetary wagers placed by the respective fighters.

16. It can be challenging for dog fighters to find an opponent with a dog of the same weight and sex who is looking to fight that dog at the same time of year, and for a wager that is mutually agreeable to both parties. For that reason, dog fighters rely heavily on each other and on extensive networks of contacts to find an opponent who has a dog of the same weight and sex and who is looking to fight that dog at the same time of the year. The practice is known as "calling out a weight." Dog fighters often "call out a weight" to known dog fighters in several states, to increase their odds of finding a match. "Calling out a weight" is done by telephone, text message, e-mail, or other electronic communication. It is an integral practice without which many dog fights would not occur.

17. Dogs matched for future fights are expected to achieve their established target weight by the scheduled match, much like in human boxing matches, requiring close attention to a dog's routine. Training can take place in a dog fighter's "yard" or indoors away from public view, such as in a basement.

18. Because of their conditioning and training, dogs used in animal fighting ventures are housed separately from other dogs – in pens, cages, or on chains – so that they will not hurt or

kill other dogs when the handler is absent. Heavy chains are often used when restraining dogs to develop neck strength in dogs used for fighting purposes.

19.     Dog fighters often take steps to house fighting dogs away from public view, such as by placing them at the back of property lines, inside sheds, garages, barns, or basements, or by erecting tall opaque fences around areas where fighting dogs are housed.

20.     Although dogs used for fighting are often housed outside, as the match date approaches, a dog in a keep may be housed indoors or near the owner/handler for several reasons. One reason is to prevent the dog from becoming sick or injured by other dogs before the match, which could cause the dog to forfeit and the owner to pay a forfeit fee. Another reason is that dogs in a keep require constant exercise and monitoring, which is easier when the dog is in close vicinity rather than off-site or outside. Dogs intended for fighting purposes are also often housed inside residences if they are injured, ill, pregnant, weaning, or if a dog fighter does not have another location to keep them or wants to keep them out of view.

21.     Underground dog fighting publications similar to magazines are routinely published and distributed to readers through periodic subscriptions, which describe and report on recent fight details and past results from around the country using coded language. They also describe various "kennels" or dog breeders who raise dogs for animal fighting purposes. In addition, there are online and electronically distributed versions of published magazines that serve the same purpose.

## PROBABLE CAUSE

### *Investigative Background*

22.     The FBI has used a particular CHS for narcotics and dog fighting investigations, whose information is considered reliable, as the CHS has provided accurate information that law enforcement subsequently corroborated by other investigative techniques.

23.     The CHS knows Alex Eugene BENEFIELD ("BENEFIELD") in the context of dog fighting and has further known BENEFIELD since they were teenagers. The CHS reported BENEFIELD is one of the top dog fighting trainers and dog fighters in South Florida and knows BENEFIELD to be consistently involved in dogfighting as early as 2014.

24.     On or about February 7, 2023, at the direction of law enforcement, the CHS met BENEFIELD at 1261 SW 10th Terrace, Deerfield Beach, Florida (the "BENEFIELD's residence"). The meeting was captured over audio and video recording.

25.     During the conversation, BENEFIELD discussed dogs that he trained for INDIVIDUAL 1 for the purposes of dogfighting. At one point, BENEFIELD noted three other dog fighters, INDIVIDUAL 1, INDIVIDUAL 2, and INDIVIDUAL 3, which law enforcement have identified as prominent South Florida dog fighters.

26.     BENEFIELD explained he had trained a dog for INDIVIDUAL 1 to enter a fight that had recently lost. Referring to the dog fights, BENEFIELD told the CHS, "[INDIVIDUAL 3] won two that night. He beat [INDIVIDUAL 1] and [INDIVIDUAL 2]."

27.     BENEFIELD then explained to the CHS that, following the fight that INDIVIDUAL 1 lost, INDIVIDUAL 1 had complained about the way BENEFIELD had trained INDIVIDUAL 1's dog. BENEFIELD relayed to the CHS that he had confronted INDIVIDUAL 1

about the complaining and said that he told INDIVIDUAL 1 that, "You lost two with Black, but you didn't told me you won six straight with the man."

28.     BENEFIELD then bragged about his training of INDIVIDUAL 1's fighting dog, noting that INDIVIDUAL 1 "had a red dog won in two hours, I did for him, he had a black dog I won two straight with him he just went to become a champion."

29.     BENEFIELD continued bragging and noted his training had won five dog fights for INDIVIDUAL 1, stating "then he had a dog named Nigo I won two with, that's five," BENEFIELD complained, "You win six straight and then lose two and now it's my fault."

30.     During the meeting, BENEFIELD called INDIVIDUAL 2 on his cellular phone to discuss INDIVIDUAL 1 and INDIVIDUAL 2's dog fight losses and BENEFIELD's training of INDIVIDUAL 1's fighting dog.

31.     Thereafter, on or about March 22, 2023, at the direction of law enforcement, the CHS again met with BENEFIELD at BENEFIELD's residence. The meeting was captured over video and audio recording.

32.     During the conversation, BENEFIELD showed the CHS a video on his phone of BENEFIELD's dog, "Blueface," killing and eating one of the dogs in the backyard of BENEFIELD's residence. BENEFIELD stated, "this is what I come home to." BENEFIELD continued, "when I come in the yard, that's what I find," "you see him eating her, that's Blueface son. I come in the yard, he eating her. That's the fifth one he killed. He done killed five. This Blueface son, he done
killed five."

33.     BENEFIELD showed the CHS another video of a female dog fight on his phone. BENEFIELD narrated the dog fight and described the techniques the dogs were using during the

fight. BENEFIELD stated, "Just eat it like that, just watch, bitch on the bottom biting where she can."

34.     On December 14, 2024, at the direction of law enforcement, the CHS met again BENEFIELD at BENEFIELD'S residence. The meeting was captured over audio and video recording.

35.     After arriving at BENEFIELD'S residence, the CHS could hear what sounded like dozens of dogs barking and crying. According to the CHS, the sounds of the dogs were coming from BENEFIELD's backyard.

36.     BENEFIELD discussed having bred dogs for dog fighting. When the CHS asked about "Blueface," BENEFIELD told the CHS, "I been sold Blueface…that's his son. He another murderer, he done killed two or three himself, his son Capone, Blueface's son."

37.      BENEFIELD told the CHS he fought his dog against another dog fighter's dog at a dog fight on December 11, 2024, in Broward County. Throughout the conversation with the CHS, BENEFIELD made several comments appearing to indicate that he was angry that he lost to a dog fighter using a dog that BENEFIELD had previously owned.

38.     BENEFIELD asked the CHS to join him in his backyard to see the dog BENEFIELD fought and lost with. BENEFIELD told the CHS that BENEFIELD's dog weighed in at thirty pounds for the fight and the other dog fighter's dog weighed in at thirty-five pounds for the fight. BENEFIELD thereafter weighed the dog in front of the CHS to prove the dog is only 30 pounds.

39.     BENEFIELD explained to the CHS that he ultimately conceded that dog fight because the other dog was causing too much damage to BENEFIELD's dog's face. Specifically, BENEFIELD showed the CHS the dog's face and said, "that's why I broke it up because they

going to fuck my face up. She ate my face up real good. They going to fuck my dog up. So, I didn't want that," BENEFIELD continued, "she too weak to do anything."

### *January 14, 2025 Search Warrant*

40.     On January 14, 2025, law enforcement executed a search warrant at BENEFIELD's residence.

41.     In the backyard of BENEFIELD's residence, law enforcement found at least 34 dogs in cages, kennels, and on chains. Law enforcement observed that each dog—except for three puppies—was caged separately. Based on my training and experience and information provided to me by other law enforcement personnel with experience in dogfighting investigations, I know that dogfighters often keep their dogs separately kenneled to keep the dogs from attacking one another.

42.     Moreover, the dogs exhibited signs of being involved in dogfighting, to include scarring and various other injuries. For example, one of the dogs was missing part of their lip, which is consistent with wounds suffered from dogfighting.

43.     A photograph depicting one of the kennels and one of the dogs is below:



44.     In the backyard of BENEFIELD's residence, law enforcement also found an apparent training shed, including equipment consistent with dog fighting training, and a structure for general storage and where an individual claimed to be residing, as discussed further below.

45.     BENEFIELD's backyard also contained a carpet mill. Carpet mills are used to increase a dog's endurance and are often used to train dogs for dogfighting. In general, the dog will be chained to a long arm of the carpet mill and an "agitator," which is used to get the dog to chase it. A photograph of the carpet mill is below:



46.     Next to the carpet mill, law enforcement observed a spring pole. I know that dogfighters use spring poles to strengthen the dog's jaws by hanging from it.



47.     Law enforcement also found slat mills next to the training shed. Slat mills are manually powered and do not require electricity. I know that slat mills such as these are commonly used to condition dogs for dogfighting to improve endurance.

48.     At least one of the slat mills appear to be manufactured by Dog Trotter USA. A representative from the company stated that Dog Trotter USA was headquartered in Winchester, Virginia.

49.     Inside the training shed, four treadmills were plugged in and had plywood pieces added to the sides to keep the dog from falling off either side. Additionally, the treadmills had a metal chain attached to the front of the treadmills to ensure the dog continued training. A photograph of one of the treadmills is below:



50.     Two of the treadmills appear to be manufactured by Weslo. Open source research revealed Weslo is owned by Icon Health & Fitness, Inc., which is headquartered in Logan, Utah.

51.     Hanging on the wall of the inside of the training shed by the treadmills, law enforcement also found multiple weighted collars and vests in varying styles. I know that dogfighters commonly use weighted collars to increase the dog's neck strength and vests to increase the dog's endurance.

52.     Law enforcement also found a hanging scale set up in a designated area. I know dogfighters commonly use scales such as these to weigh the dogs to determine whether they will make the agreed upon fighting weight for dogfights. A photograph of the scale area is below:



53.

54.     Following a *Miranda* warning, law enforcement interviewed an individual who resided in a structure in the backyard of BENEFIELD's residence, inside of which law

enforcement found a sleeping bag on the ground. The individual claimed to have known BENEFIELD since childhood and that, approximately three years ago and after being released from prison, he reconnected with BENEFIELD and has been residing in the backyard structure since.

55.     The individual confirmed BENEFIELD resided in the house. The individual referred to BENEFIELD as "bossman" and claimed that BENEFIELD told him to train the dogs. BENEFIELD provided the individual a place to stay, food, and, periodically, with money for clothes.

56.     The individual trained the dogs for BENEFIELD and explained to law enforcement that BENEFIELD provided specific instruction on how to train the dogs. For example, BENEFIELD would instruct on the amount of hours or minutes that the dogs should be on the treadmill, BENEFIELD would also tell him to put the dog on the carpet mill by attaching the dog to one arm and putting an agitator or stimulant on one of the other arms to increase the dog's endurance. BENEFIELD also instructed on how far to walk to dogs and that BENEFIELD did not like him walking the dogs out on the street because they might alert law enforcement.

57.     Of the dogs at BENEFIELD's residence, the individual claimed approximately eight of the dogs belonged to BENEFIELD and that the remaining dogs belonged to various individuals that left their animals to be trained by BENEFIELD.

58.     The individual noted that he had not observed a dogfight at BENEFIELD's residence, but that the dogs would sometimes come to BENEFIELD's residence injured and that BENEFIELD would administer veterinary-type care. The individual stated that these medications

are kept in the refrigerator in the house. In the refrigerator, law enforcement found various medications, consistent with what the individual had told law enforcement.

59.     The individual stated that BENEFIELD was training three of the dogs for a fight scheduled for this Saturday.

60.     Post-*Miranda*, BENEFIELD denied residing at BENEFIELD's residence and denied that the dogs were his, claiming they belonged to an individual named "Tyrone Butler" who had been missing. Law enforcement found a flier on the wall inside BENFIELD's residence for an individual of the same name who had been missing since August 18, 2020. BENEFIELD also denied that he had ever fought or trained dogs for dogfighting.

### CONCLUSION

61.     Based on the above statements, I believe there is probable cause to find that Alex Eugene BENEFIELD committed violations of 18 U.S.C. § 371 and 7 U.S.C. 2156(b).

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

Respectfully submitted,

_____

Hunter I. Sargent, Special Agent
Federal Bureau of Investigation

*Pursuant to Federal Rule of Criminal Procedure 4.1, the contents of the present affidavit were telephonically sworn to before me on this* 15th *day of January, 2025.*

_____

HONORABLE JARED M. STRAUSS
UNITED STATES MAGISTRATE JUDGE

18

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: 25-mj-2023-STRAUSS

### BOND RECOMMENDATION

DEFENDANT: **ALEX EUGENE BENEFIELD**

**PTD**

(**Personal Surety**) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____

AUSA:   Alexandra D. Comolli

Last Known Address: **1261 SW 10th Terrace**

**Deerfield Beach, Florida 33441**

What Facility:

Agent(s):   **SA Hunter Sargent**
Federal Bureau of Investigation